UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:16-cr-113-GEB |
| Plaintiff, | |
| v. | **AMENDED ORDER** |
| Joshua Ramson, | |
| Defendant. | |

On August 15, 2016 Defendant Joshua Ramson filed a motion to "suppress all evidence obtained in a traffic stop and [subsequent frisk] conducted [on him] in this case." Def.'s Mot. to Suppress ("Mot.") 1:17-18, ECF No. 32. Ramson argues his seizure by two Sacramento Police officers was unlawful because "he was a passenger in a rented vehicle [driven by Sashae Brown] which was stopped by [the police officers] for no obvious reason[,]" and no justification existed for the frisk to which he was subjected during his detention. Id. at 1:20-24.

Ramson requested an evidentiary hearing on his motion

and the request was granted; the evidentiary hearing was held on November 14, 2016. Following the evidentiary hearing, Ramson filed a supplemental brief in which he argues:

> In briefing for the motion to suppress both parties incorrectly assumed that the case involved whether the traffic stop was valid based on the officers['] observations of a traffic violation. Both parties incorrectly assumed there was a traffic stop. In its opposition, the United States alleged as fact that "Officers Mustafa Mohammad and Pamela Massee while on routine patrol, <u>stopped the car</u> in which Ramson was a passenger at 4:50 a.m. . . ." The United States' Opposition only argued that Mr. Ramson was lawfully detained as a passenger in a car during a routine traffic stop under <u>Arizona v. Johnson</u>, 555 U.S. 323, 332 (2009). The <u>United</u> States presented no legal justification for Mr. Ramson's detention other than the alleged fact that there was a traffic stop. Defense conceded that if there was a lawful traffic stop the passenger was also lawfully detained under the <u>Arizona v. Johnson</u> doctrine.
>
> At the evidentiary hearing both officers testified that there was no traffic stop. The prosecutor asked . . . Officer Massey if "it was a traffic stop?" Officer Massey answered, "It was not." Officer Massey testified that the car "basically just stopped." Officer Massey testified that the car was "double parked." Officer Mohammed testified that he "noticed the vehicle come to a stop." He parked his vehicle and turned on his spotlights, but did not turn on the flashing lights. Officer Mohammed testified that after he approached the parked car he "asked the passenger, Joshua Ramson," for his identification and both Mr. Ramson and the driver provided identification. Officer Mohammed testified that while he was checking Mr. Ramson's identification for warrants Mr. Ramson was not detained. Officer Mohammed testified he detained the driver, but never told Mr. Ramson he was not free to leave. Officer Masee confirmed that Officer Mohammed asked the driver and passenger for their identification. Officer Massee testified that the stop was not a traffic stop and stated "we didn't activate ou[r] red and blue

2

> lights to effect what I would consider a traffic stop."
>
> . . . .
>
> Officer Massee testified she did not think she ever told Mr. Ramson he was not free to leave and could not remember whether she told Mr. Ramson he was not free to leave. She testified that she considered Mr. Ramson not free to leave until the officers had completed the record check for warrants and probation. Officer Mohammed testified that Mr. Ramson's criminal record check took three minutes. Officer Mohammed testified that he turned on the dashboard camera at approximately 4:59 a.m. which was after he had completed the record check for Mr. Ramson. According to the dashboard camera video, at 5:05 a.m. Officer Massee frisked Mr. Ramson. Officer Massee testified that she was the one who decided to do a pat-search of Mr. Ramson.

Def.'s Suppl. Br. ("Suppl. Br.") 1:20-3:2, ECF No. 59 (citations omitted). Ramson also argues: "[e]ven if the Court [finds] that there was a traffic stop, the evidence from the hearing clearly shows an unreasonable delay" between the stop or seizure and the frisk of Ramson for weapons. Suppl. Br. at 7:26-27.

**FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires a federal court considering "factual issues . . . involved in deciding a motion . . . [to] state its essential findings on the record." Fed. R. Crim. P. 12(d). The factual findings comprise the following testimony given during the evidentiary hearing and decisions based on that testimony.

The testimony given at the evidentiary hearing evinces the following. Sacramento Police Officers Pamela Massee and Mustafa Mohammad were on patrol in a neighborhood known to have a relatively high crime rate. At that time, it was completely dark

3

1  outside.

2  Massee "observed [a Chrysler 200] turn northbound onto
3  Grove[;]" she "could see that the headlights were on, but as soon
4  as [the Chrysler 200] turned onto the street there was nothing on
5  the back side, which is a safety concern." RT 6:1-4, ECF 57.
6  She could not see the driver, passenger or how many people were
7  in the vehicle. Id. at 6:11-17. Officer Mohammad also saw the
8  car moving without rear lights, and when he made his observations
9  he could not see an occupant in the car. RT 48:13-23.

10  Special Agent Sara Lewis with the Bureau of Alcohol,
11  Tobacco, and Firearms testified at the hearing about the lights
12  in the Chrysler 200. Special Agent Lewis is the case agent for
13  the case and adopted this case from the Sacramento Police
14  Department. The Chrysler 200 was a rental car, and Special Agent
15  Lewis contacted the company that rented the car and personally
16  examined the controls for the car's lights; she inspected the car
17  and found a control setting "that would allow the [car operator]
18  to drive with the headlights on and all the taillights off." RT
19  84:1-4. Therefore, each Sacramento Police officer's testimony
20  that the rear lights were off when the car was driven on May 7,
21  2016 is credited.

22  The police officers followed the Chrysler 200. Officer
23  Massee testified:

24  > As we turned north onto Fernley, I saw the
car get about halfway down the block, and it
25  > basically just stopped in the middle of the
road[;] Fernley has vehicles parked on both
26  > the east and the west side. And so it would
appear as if maybe the car was going to try
27  > to parallel park, or it appeared like it
might have tried to do that, except the spot
28  > where it would have been parallel parking to

4

|   |   |
|---|---|
| 1 | is, like, a driveway, so it just stayed put there in that position. |
| 2 | RT 7:16-23. |

Officer Mohammad stopped the patrol car behind the Chrysler 200, and then "turned on [the patrol car's] spotlights and . . . clear overhead lights, [the] takedown lights, due to the time of morning and [since the] sun was not out. It was still dark." RT 49:16-22. At this time it was approximately 4:40 a.m. on May 7, 2016.

Officer Mohammad exited the patrol car and approached the driver's side of the vehicle, and "advised [the driver Sashae Brown] that her brake lights or her taillights were out," and asked her and the passenger Joshua Ramson for identification. RT 50:25-51:9. Officer Massee went to the passenger side, where she saw Ramson "reclined back into his seat." Id. at 9:9.

Officer Massee stood next to the passenger door of the car while Officer Mohammad returned to the patrol car to run license checks on Brown and Ramson. The "records check on the driver . . . returned with a suspended driver's license. And . . . [the] records check on Mr. Ramson . . . [returned] with an extensive . . . gun history, gang affiliations and other numerous charges[;]" and showed "he had a history of being armed and dangerous[,]" and "he was categorized as being assaultive towards police." RT 51:14-18, 52:4-6, 52:11-13. Ramson's license was also suspended. Id. at 33:14-15. The evidentiary record reveals that "[p]er the California Penal Code," a car "gets towed" when all occupants have suspended licenses. Id. at 69:15-17

"After [Officer Mohammad] saw the gang history and the

5

1  career criminal [information concerning Ramson, he] requested an
2  additional unit." RT 52:17-18.  Officer Mohammad "did not radio
3  the additional unit, [he] messaged them via the computer because
4  at [that] time Officer Massee was still speaking to Mr. Ramson
5  near the vehicle [and he] did not want [Ramson] him hearing [that
6  he was] requesting an additional unit." Id. at 52:18-22.

7  　　　　　Officer Mohammad then returned to the Chrysler 200.
8  Officer Mohammad "advised [Officer Massee] that the driver was
9  suspended . . . [and] the passenger had a gun arrest history."
10 RT 9:20-22.  He also let her know that back up officers "were en
11 route."  Id. at 12:17-18.  Officer Mohammad then spoke to Brown
12 "outside the car."  Id. at 55:24-56:1.  He was still speaking to
13 Brown when the backup officers arrived.  After they arrived he
14 "detained [Brown] in the back seat of [a] patrol vehicle," so
15 that the officers "didn't have to keep an eye on her and [Ramson]
16 at the same time."  Id. at 56:4-8.  Officer Mohammad estimated it
17 took the backup officers two to four minutes to arrive after he
18 summoned them.  Id. at 55:16-20

19 　　　　　Officer Massee testified that while she was stood next
20 to Ramson on the passenger side of the car, his demeanor was
21 "[v]ery stoic . . . --his hands interlaced . . . , and seated on
22 his lap very politely, [a]nd he looked forward, and he just
23 looked straight out of the vehicle." RT 15:2-4.  Ramson "didn't
24 really make a lot of eye contact with [Officer Massee].  And he
25 didn't have a lot of small -- small chat . . . Something was off
26 about [his behavior]" that caused her concern.  Id. at 15:5-12.

27 　　　　　Office Massee then had Ramson step out of the car and
28 she frisked him for weapons.  RT 15:13-23.  Officer Massee

identified a gun under Ramson's jacket.  Id. at 15:24–16:3.

**DISCUSSION**

**A. Legality of traffic code violation detention**

Ramson contends that the traffic violation seizure of the occupants of the Chrysler 200 was unlawful, and that his detention was unlawfully prolonged while the officers waited for backup officers to arrive at the detention scene.

However, the Sacramento Police Officers contacted Brown because the taillights of the car Brown drove were not illuminated as required by the traffic code when driving at night.

Further, "police [may] detain an automobile and its occupants [for] inquiry into a vehicular violation." Arizona, 555 U.S. at 327. "[T]he police activity that normally amounts to intrusion on "privacy and personal security" [when investigating a traffic code violation] does not normally (and did not here) distinguish between passenger and driver." Brendlin v. California, 551 U.S. 249, 257 (2007). The Supreme Court states in Brendlin v. California that "[a] sensible person would not expect a police officer to allow [him] to come and go freely from the physical focal point of [a traffic] investigation into . . . wrongdoing." Id.  "It is also reasonable for passengers to expect that a police officer at the scene of [the] investigation will not let people move around in ways that could jeopardize his safety." Id. at 258.

Vehicular traffic code violation investigations can implicate "officer safety interest[s]" because they "are 'especially fraught with dangers to police officers.'" Rodriguez

7

v. United States, 135 S.Ct. 1609, 1616 (2015) (quoting Johnson, 555 U.S. at 330). "[A]n officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." Id.  Such safety precautions apply to drivers and passengers alike. Brendlin, 551 U.S. at 257.

Therefore, the traffic code violation detention about which Ramson complains was lawful.

### B. The detention was not unlawfully prolonged

Ramson also argues the traffic code violation investigation was "unlawfully prolonged under Rodriguez v. United States." Suppl. Br. 8:13–14. Ramson contends the "uncontroverted evidence [shows] that the officers waited six minutes after receiving the results from the record check of [Ramson] before conducting the pat-frisk." Id. at 8:10–12. Ramson argues "[s]ince Rodriguez held that a four minute delay to get a drug dog for a sniff was unlawful, a six minutes delay of a detention to wait for back up before frisking a person who was not suspected of anything must also be unlawful." Id. at 8:14–16. However, the Supreme Court found in Rodriguez that the "dog sniff [in that case was] not fairly characterized as part of the officer's traffic mission" justifying the detention. Rodriguez 135 S.Ct. at 1615.  The Supreme Court reaffirmed in Rodriguez, that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'–to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez, 135 S.Ct. at 1614 (citation omitted) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

Here, the record evinces that the officer safety

concern of safely removing Ramson from the car that would be towed made the delay involved with the arrival of backup officers part of the vehicle traffic code enforcement mission. Therefore, Ramson's detention was not unlawfully prolonged.

**C. The frisk was justified**

Ramson also argues "there was [an] insufficient basis for the officer to have a reasonable suspicion that [Ramson] was 'armed and dangerous' as required to frisk under Arizona v. Johnson." Suppl. Br. 8:19-21. Ramson contends "the only information Officer Massee knew before deciding to frisk [him] was that he had been arrested for gun allegations," so "there was no basis to believe he was presently armed and dangerous." Id. at 8:24-26.

Under Fourth Amendment jurisprudence, an officer may frisk a person only if the officer has a "justified . . . concern for the safety of the officer and others in proximity." Thomas v. Dillard, 818 F.3d 864, 876 (9th Cir. 2016). To justify a frisk, the officer must have had a "reasonable suspicion [that the frisked person was] armed and dangerous . . . " Id. "Reasonable suspicion is an objective standard, asking whether "a reasonably prudent [person] would have been warranted in believing [the suspect] was armed and thus presented a threat to the officer's safety" while the officer engaged to legitimate police activities. Id. This suspicion "is formed by specific, articulable facts . . . together with objective and reasonable inferences." United States v. Burkett, 612 F.3d 1103, 1107 (9th Cir. 2010). "The determination [can be] made with reference to the 'collective knowledge of the officers involved, and the

9

inferences reached by experienced, trained officers.'" Id. (quoting United States v. Hall, 974 F.2d 1201, 1204 (9th Cir. 1992)).

Here, when Officer Mohammad ran a records check on Ramson, his query returned information that Ramson had an extensive gun history, had gang affiliations, had been assaultive towards police, was a career criminal, and had a history of being armed and dangerous. RT 51:15-52:15. Officer Mohammad then became "more [concerned about] officer safety." Id. at 53:7-10. Officer Mohammad then requested backup, but used his computer rather than radio for the request because he "did not want [Ramson] hearing [him] requesting an additional unit" for fear that Ramson would try to fight or try to escape. Id. at 52:19-53:3. Officer Mohammad subsequently returned to the Chrysler 200 and informed Officer Massee, in a circumspect way, that his record check of Ramson revealed concerns that Ramson had a history with guns, and that backup officers were summoned. Id. at 10:24-25, 12:11-14, 28:8-10, 42:22-43:2, 54:25-55:2, 70:2-11, 71:10-13.

Officer Massee testified that Ramson's behavior caused her concern since he was "very stoic[,]" had "his hands interlaced and seated on his lap very politely[,]" "looked forward . . . straight out of the vehicle[,]" "didn't really make eye contact with [her,]" and "didn't have a lot of . . . small chat." RT 15:2-6. According to Officer Massee, "something was off about [his behavior]." Id. at 15:7-10. Officer Massee also testified she had a heightened concern for officer safety because the encounter occurred late at night in a high crime rate

neighborhood. Id. at 13:6-11. Both officers' safety concerns evince that they "reasonably suspect[ed] [Ramson could be] armed and dangerous." Johnson, 555 U.S. at 327.

Ramson argues the caution information from Officer's Mohammad's record check "cannot create reasonable suspicion to search [Ramson]" because "neither of the officers knew how old . . . the warnings were." Def.'s Suppl. Reply ("Suppl. Reply") 6:4-7, ECF No. 61. Officer Mohammad testified he did not know when the caution information was placed in the record check computer system. RT 72:6-11. However, he also testified in response to a question that he would not "have given the [caution information] less weight if [he] knew it had been [placed in the record check computer system] 15 years ago." Id. at 72:12-14.

Ramson also argues "[e]ven if Officer Mohammad had seen the caution [information] which reported [Ramson's] resisting arrest [sic] from fifteen years earlier, this caution [information] was never conveyed to Officer Massee so it cannot be relied on [to] support her independent decision to frisk." Suppl. Br. 8:28-9:3.

Ramson's contention that the caution information should be disregarded because all of that information was not conveyed to Officer Massee disregards the collective knowledge doctrine. "The determination [of reasonable suspicion to believe a passenger in a vehicle is armed and dangerous can be] made with reference to the 'collective knowledge of the officers involved.'" Beckett, 612 F.3d at 1107 (quoting Hall, 974 F.2d at 1204).

Under the collective knowledge doctrine, [the

11

> Court] must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by "look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]."

United States v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007) (alteration in original) (quoting United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986)).

Here, although Officer Massee actually performed the frisk of Ramson, Officer Mohammad participated in the frisk as the "cover officer." In that role, Officer Mohammad watched the frisk to assist Officer Massee and to provide backup if Ramson "[tried] to fight Officer Massee." RT 56:14-18. Officer Massee and Officer Mohammad were "functioning as a team" rather than "acting as independent actors" who merely happened to be involved in the same encounter. Ramirez, 473 F.3d at 1033. Thus "[t]he officers involved were working in close concert with each other and the knowledge of one of them was the knowledge of all." Id. (quoting United States v. Bernard, 623 F.2d 551, 561 (9th Cir. 1979)). In light of everything the officers knew about Ramson from the records check, as well as the time and place of their investigation and Ramson's behavior while seated in the car, the officers reasonably suspected Ramson was "armed and dangerous" and the frisk was justified. Johnson, 555 U.S. at 327.

## CONCLUSION

For the foregoing reasons, Ramson's motion to suppress, ECF No. 32, is hereby DENIED.

**STATUS HEARING SCHEDULED**

In light of the above ruling, the hearing on the suppression motion scheduled on December 16, 2016 is converted to a status hearing.

IT IS SO ORDERED.

Dated: December 16, 2016

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge